IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TREMAYNE D. EDWARDS,

      Plaintiff,
 v.

JOLINDA WATERMAN, SONYA ANDERSON,
MARK KARTMAN, PHILIP FRIEDRICH, JERRY
SWEENEY, CARRIE SUTTER, BRIAN KOOL, GARY
BOUHGTON and JONI SHANNON-SHARPE,[1]

      Defendants.

OPINION and ORDER

16-cv-265-jdp

---

  Pro se plaintiff and prisoner Tremayne D. Edwards is proceeding on claims that medical and nonmedical staff at Wisconsin Secure Program Facility violated the Eighth Amendment and state law by denying him appropriate footwear for his plantar fasciitis. Before the court are the parties' cross motions for summary judgment. Dkt. 42 and Dkt. 49. I am granting defendants' motion and denying Edwards's motion because no reasonable jury could conclude that any defendant was deliberately indifferent to Edwards's foot condition or that the either of the nurse defendants committed medical malpractice.[2]

---

[1] The parties use several different spellings for Philip Friedrich's name throughout their briefing. I have amended the caption to reflect the spelling used in his declaration. Dkt. 63.

[2] Also pending is Edwards's motion for reconsideration of the court's order granting defendants additional time to respond to Edwards's motion. Dkt. 54. I will deny the motion because the extension did not cause any significant prejudice to Edwards.

UNDISPUTED FACTS

From the parties' proposed findings of fact and evidence in the record, I find that the following facts are undisputed, unless otherwise noted. I note that Edwards did not respond to any of defendants' proposed findings of fact. Therefore, I am treating all of defendants' proposed facts as undisputed unless they are contradicted by the evidence that Edwards submitted in support of his own proposed facts. *See* Prel. Pretrial Conf. Order, Dkt. 28, at 15 ("The court will conclude that a proposed fact is undisputed unless the responding party explicitly disputes it and either identifies contradictory evidence in the record, or demonstrates that the proponent of the fact does not have admissible evidence to support it.").

A. The parties

Edwards is confined at Wisconsin Secure Program Facility, where all of the defendants worked during the relevant time period. Jolinda Waterman was the health services manager; Sonya Anderson was a nurse; Jerome Sweeney and Mark Kartman were security directors; Carrie Sutter was the financial program supervisor; Joni Shannon-Sharpe was a lieutenant; Brian Kool was a unit manager; Phillip Friedrich was the restrictive housing unit property manager; and Gary Boughton was the warden.

B. Treatment for Edwards's plantar fasciitis

On March 26, 2012, Dr. Burton Cox, a WSPF physician, diagnosed Edwards with plantar fasciitis, which is inflammation of the band of tissue that runs across the bottom of the foot. Edwards's plantar fasciitis causes him persistent, chronic pain that affects his daily activities and limits his ability to walk, jog, and engage in vigorous activities requiring the use of his feet and legs.

Dr. Cox referred Edwards to the University of Wisconsin Podiatry Associates for consultation. At Edwards's first appointment with UW Podiatry in May 2012, a podiatrist recommended that Edwards's plantar fasciitis be treated with pain medication, ice, and stretches. The podiatrist also recommended that Edwards obtain a new pair of athletic shoes that were more substantial than his state-issued shoes, such as New Balance or ASICS shoes. Edwards was cast for custom orthotics. When he returned to WSPF, the health services unit approved the order for ice and naproxen and provided Edwards with orthotics.

In October 2012, Edwards saw another UW podiatrist, Dr. Finnell. Finnell noted that Edwards was wearing canvas-style shoes and that Edwards wanted to order shoes that provided more support. Finnell gave Edwards a referral for physical therapy and ordered night splints for him. After Edwards returned to the prison, he wrote Finnell a letter, asking Finnell to notify WSPF's health services unit in writing that Edwards should be allowed to order supportive shoes from the Eastbay catalog. Edwards wrote that he wanted to order the "Nike ACG Air Max Goadome TT," a shoe that Edwards had worn "on the street." Dkt. 72-1 at 11. (At the time, Eastbay was not one of the three DOC-approved vendor catalogs from which inmates could order property.) On October 29, Finnell sent a note to WSPF's health services unit stating, "Please allow Mr. Edwards to order shoes from the Eastbay catalog. Dx: plantar fasciitis." *Id.* at 12. (It is not clear from the record whether health services took any action on Finnell's October 29 recommendation.)

In December 2012, Edwards had a follow-up appointment with Dr. Finnell. Finnell told Edwards to continue with physical therapy, stop wearing canvas shoes, and order an athletic-style shoe that would accommodate his orthotics. Edwards told Finnell that he had never received his night splints and could not find his orthotics, so Finnell ordered Edwards a new

3

pair of custom molded orthotics. When Edwards returned to WSPF, Edwards submitted a health service request stating that Finnell had recommended that he be allowed to order personal shoes from Eastbay. Defendant Waterman, the health services unit manager, responded to the Edwards on January 7, 2013, stating that Edwards could order shoes from one of the approved vendor catalogs, but that he could not order from Eastbay. Waterman also told Edwards that WSPF had not received his night splints yet. In January 2013, Edwards received his new orthotics.

On February 25, 2013, Edwards saw Dr. Finnell again at UW Podiatry. Edwards told Finnell he had not received the night splints or the new orthotics, so Finnell told him he would order new ones. Finnell again advised Edwards to stop wearing the "canvas-style state-issued shoes" and to "order a pair of athletic-style shoes to accommodate the orthotics, such as a Nike Air Max." Dkt. 72-1 at 21.

Health services staff referred Dr. Finnell's February 25 recommendation to WSPF's special needs committee, which is a designated committee that addresses requests for special items and restrictions for inmates. The committee is comprised of a staff representative from the health services unit, a staff representative from security, and a non-security staff representative. According to DOC policy, any request for property for a medical issue that costs more than $75 or that does not meet other requirements of DOC property policies must be reviewed by the special needs committee. The committee determines whether the inmate has a medical necessity for the special item or medical restriction and considers whether the item or restriction would raise security concerns.

The special needs committee met on March 13, 2013, to consider Edwards's need to order athletic shoes. The committee consisted of defendant Sweeney and two other staff

4

members who are not defendants. The committee concluded that Edwards could order athletic-style shoes through a DOC-approved vendor catalog that could accommodate orthotics.

Edwards was dissatisfied with the decision because the Nike Air Max shoe he wanted to order was not available in the DOC-approved vendor catalogs and cost more than $75. Additionally, the version of the Air Max shoe that Edwards wanted is not an athletic-style shoe; it is a boot with an air cushion. Edwards wrote to Dr. Finnell again, asking Finnell to send a new recommendation to WSPF clarifying that Edwards did not need a "basketball style shoe" and should be permitted to order the Nike Air Max boot. Dkt. 72-1 at 23. Finnell complied, faxing a new recommendation to the health services unit stating, "(1) Please D/C [discontinue] basketball style shoe; (2) Please order Nike Air Max ACG TT Goadome due to foot disorder." *Id.* at 27. (There is nothing in the record suggesting that Edwards was using a "basketball style" shoe at this time.)

When Edwards saw Dr. Finnell again in April 2013, he had not yet ordered athletic shoes. Finnell dictated in his report after the visit: "Please discontinue wearing the state issued canvas style shoes and allow patient to order Nike Air Max Goadome shoe to accommodate his orthotics." *Id.* at 29. (It is not clear from the record whether health services took any action on Finnell's April 2013 recommendation.)

Edwards saw Dr. Finnell for at least three appointments between June 2013 and January 2014. During that time period, Edwards wrote Finnell multiple times asking that he again write to WSPF's health services unit about Edwards's shoe restriction. Dkt. 72-1 at 32, 39. In response to Edwards's letters, Finnell sent another memo to the health services unit in January 2014, recommending that Edwards be allowed "to purchase extra deep shoes (i.e. Nike ACG Air Max) to accommodate orthotics (no particular price restriction)." *Id.* at 41. Health services

5

did not approve the request, however, as health services staff interpreted Finnell's note as recommendation that Edwards purchase a shoe that would accommodate the orthotics, but not necessarily the Nike Air Max shoes in particular. Waterman believed that the DOC-approved vendors offered shoes that satisfied Finnell's recommendation.

Between March 2014 and October 2014, Edwards saw Dr. Finnell for six off-site appointments for treatment of his plantar fasciitis. At the October 2014 appointment, Finnell noted that Edwards, "would like to be able to purchase an athletic-style shoe, such as 'Nike ACG Geodome.' This is permitted as this will accommodate his orthotic better than the canvas-style shoes." Dkt. 72-1 at 52. When he returned from the appointment, Edwards submitted a health services request asking to be allowed to purchase the Nike Air Max shoes. Waterman denied the request, and the request was forwarded to the special needs committee.

The special needs committee met in November 2014 to consider the request. Defendants Sweeney, Sutter, Shannon-Sharpe, Anderson, and a social worker who is not a defendant were on the committee. The committee denied Edwards's request, concluding that Dr. Finnell had recommended "an athletic-style shoe," but that the Nike Air Max shoe in particular was not necessary to accommodate Edwards's orthotics. The committee noted that Edwards could order personal shoes as an alternative to the state-issued shoes from the approved vendor catalog, which contained shoes that met Finnell's recommendations and complied with DOC property limits.

On December 3, 2014, Waterman called Dr. Finnell's office regarding his October 2014 note recommending that Edwards be permitted to exceed the property limitations and purchase Nike Air Max shoes. Waterman explained to Finnell's staff that under DOC policy, patients cannot dictate the type or style of shoe that they order and that the health services unit does

not permit patients to order shoes that cost more than $75. Waterman also stated that if Edwards or another patient needed special medical shoes, the health services unit could provide the inmate with a medical shoe. After Waterman's phone call, Finnell wrote a new recommendation, stating that Edwards should be allowed to order an "athletic style shoe to accommodate [his] orthotics," but that the shoe did "not have to be a specific brand." Dkt. 72-1 at 53. Waterman then send a note to Edwards, stating that health services had provided him with a medical restriction to allow him to purchase shoes from a nonapproved vendor catalog to accommodate his orthotic, so long as the shoes did not exceed $75. Waterman also stated that Edwards could not "direct[] what type or style of shoe that the UW provider may recommend. The current recommendation is an athletic style shoe to accommodate your orthotics." Dkt. 72-1 at 60. (It is not clear from the record whether Edwards ordered any shoes from an approved or non-approved vendor catalog after receiving Waterman's response.)

In June 2015, Edwards was sent to the Aljan orthotic clinic in Madison, Wisconsin for treatment. After the appointment, an orthotist called Waterman and stated that Edwards had requested a specific Nike shoe and had brought Dr. Finnell's October 2014 recommendation to the appointment. It was the orthotist's opinion that Edwards had a low profile orthotic that did not require a large size or extra depth shoe and that the ASICS shoe in one of the approved-vendor catalogs would fit his orthotics. Waterman requested that Aljan send her a copy of the type of shoe that would accommodate Edwards's orthotics. Waterman later completed a medical restriction/special needs form noting that Edwards's request for a specific Nike shoe had not been granted because the approved vendor catalogs had shoes that would accommodate the orthotic, such as the ASICS shoe that the Aljan orthotist had recommended. Edwards's request was again forwarded to the special needs committee.

7

In October 2015, the special needs committee, consisting of defendants Kartman, Shannon-Sharpe, Anderson, and Waterman, denied Edwards's request to purchase the Nike Air Max shoes. The committee noted that the shoes cost $149, Edwards could purchase shoes that cost $75 or less that would accommodate his orthotics, and Dr. Finnell had only recommended an athletic-style shoe to accommodate Edwards's orthotics. After the committee made its decision, Waterman met with Edwards to talk to him about finding a shoe from one of the approved vendor catalogs that would accommodate his orthotics. Edwards became angry, told Waterman she would "see [him] in court," and left. Later that same day, Edwards met with health services staff to see if his orthotics would fit into his state-issued shoes. Edwards's progress notes state that the orthotics fit without difficulty. (It is not clear from the record whether Edwards had been wearing his orthotics with his state-issued shoes or some other shoes at this time.)

Edwards continued to send letters to Dr. Finnell, asking that Finnell send an order that would allow him to buy Nike Air Max shoes. In November 2015, Finnell wrote to Edwards stating that his "recommendation to avoid the canvas style shoe was to accommodate the orthotic properly, [because] [t]he canvas style shoes do not provide enough depth to accommodate both your feet and the orthotic." Dkt. 72-1 at 75. Finnell stated that an athletic shoe would "provide more depth to accommodate the device" and make it more functional. *Id.* He also stated that it was "impossible to determine whether or not the canvas style shoe was the cause" of Edwards's plantar fasciitis, as many circumstances can cause of the condition. *Id.* Finally, Finnell stated that Edwards did not need custom-made medical shoes because "a regular, athletic style shoe should suffice" so long as the insoles are removable. *Id.*

After receiving Dr. Finnell's response, Edwards continued to send health service requests seeking permission to order Nike Air Max shoes. Waterman has responded to each of his requests by referring Edwards to the approved inmate catalog and suggesting that he order athletic shoes as recommended by the Aljan orthotist and Finnell. Waterman has offered to look at catalogs with Edwards to see what shoes would accommodate his orthotics, but he has declined her offer.

**C. Denial of shoes sent by Edwards's mother**

In July 2015, Edwards's mother purchased a pair of Air Jordan shoes from Eastbay and sent them to Edwards, but she did not send the receipt with the shoes as is required by DOC policy. Defendant Friedrich, the property sergeant, notified Edwards that he could not deliver the shoes because Eastbay was not an approved vendor and because there was no receipt accompanying the property showing that it met the allowed cost limits. Edwards responded that he had a medical restriction that allowed him to order the shoes. Friedrich then contacted Waterman to determine whether Edwards had a medical restriction that authorized the shoes.

Waterman told Friedrich that Edwards did not have a medical restriction that authorized the shoes. Waterman also contacted Eastbay and learned that the original order was for a pair of Air Jordan shoes priced at $94.99, with $5.22 in tax, and no shipping cost, totaling $100.21. Sometime later, Edwards's mother mailed a receipt to Waterman, but Waterman believed the receipt had been altered to state that the cost of the shoes was $74.99, with $5.22 in tax, and a shipping fee of $20.00.

After speaking with Waterman, Friedrich notified Edwards that the shoes were not authorized and asked him whether he wanted Friedrich to mail the shoes somewhere, destroy them, donate them, or have them held in the property department so Edwards could file an

9

inmate complaint. Initially, Edwards told Friedrich to mail the shoes out of the institution, but later he told Friedrich that he would be filing an inmate complaint.

Edwards filed an inmate complaint and a health service request stating that his shoes were being held in the property department and that Waterman was making excuses for not giving him the shoes. Waterman responded that the shoes he ordered were not allowed under the property guidelines, that the personal shoes were not medically needed, and that his orthotics fit in his state shoes. Ultimately, Edwards's inmate complaint regarding the shoes was denied and he directed Friedrich to mail the shoes out of the institution.

**D. Boughton's involvement in Edwards's request for special shoes**

Warden Boughton is not a medical professional and does not make medical treatment decisions. He also was not on any of the special needs committees that considered Edwards's requests for special shoes. Boughton was aware of Edwards's desire to order the Nike Air Max shoes because he received several letters from Edwards requesting that Boughton grant permission for Edwards to order the shoes. On each occasion, Boughton responded that he was deferring to the decisions of the medical professionals or that Edwards's complaints were being addressed through the inmate complaint review system.

As the reviewing authority in the inmate complaint review system. Boughton reviewed the dismissal and rejection of Edwards's inmate complaints that challenged the denial of his requests to order the Nike Air Max shoes. On each occasion that he reviewed one of Edwards's inmate complaints, Boughton affirmed the rejection or dismissal of the complaint.

**E. Dr. Finnell's declaration**

Defendants submitted a declaration from Dr. Finnell in conjunction with their summary judgment materials. Dkt. 72. Finnell states in his declaration that although he sent several

recommendations to WSPF's health services unit asking that Edwards be permitted to order from the Eastbay catalog and order the Nike Air Max shoes in particular, Finnell did not make those requests because he believed that the particular shoe was medically necessary to treat Edwards's plantar fasciitis. Instead, Finnell sent the requests because of Edwards's numerous letters in which he stated that the Nike shoes would provide him more air support and cushion then the state-issued shoes. Finnell says he never intended to prescribe Edwards a specific brand of shoe and he believes that any athletic-style shoe would be sufficient to accommodate his orthotics.

ANALYSIS

A. **Eighth Amendment claim**

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To survive summary judgment, Edwards must present evidence suggesting that he suffered from an objectively serious medical condition and that the defendants knew about the condition but disregarded it. *Farmer*, 511 U.S. at 834; *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). For purposes of summary judgment, defendants concede that Edwards's plantar fasciitis is an objectively serious medical condition. The sole issue at summary judgment is whether a reasonable jury could conclude that defendants knew about Edwards's plantar fasciitis but did not properly treat it.

The uncontested record shows that Edwards has received extensive and long-term treatment for his plantar fasciitis, including numerous off-site visits to specialists, pain medication, injections, orthotics, night splints, ice, and physical therapy. Nonetheless, Edwards contends that defendants showed deliberate indifference to his plantar fasciitis by refusing to allow him to order shoes costing more than $75, such as the Nike Air Max or an equivalent shoe, from a non-approved vendor. Because Edwards focuses solely on defendants' denial of his requests to order special shoes, I will do the same.

To prove that defendants' denial of his request to order a special shoe amounted to deliberate indifference, Edwards must show that defendants knowingly disregarded an "an excessive risk to [his] health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (*quoting Farmer*, 511 U.S. at 837). Edwards has not made this showing with respect to any of the defendants.

Defendant Waterman and the other special needs committee members, Anderson, Kartman, Sweeney, Sutter, and Shannon-Sharpe, denied Edwards's requests to order Nike Air Max shoes on numerous occasions. But the undisputed evidence shows that Waterman and the committee concluded reasonably that such shoes were not medically necessary to treat Edwards's plantar fasciitis. Before denying any of Edwards's requests, Waterman and other committee members reviewed Dr. Finnell's orders to determine what in particular he was recommending. On each occasion, Waterman and the committee members concluded that Finnell's orders should be interpreted as recommending that Edwards order shoes that could properly accommodate his orthotics, but that the orders did not say that a particular brand of shoe was medically necessary. Waterman and the committee members concluded that that

Edwards could order athletic-style shoes through the DOC-approved vendor catalogs that could accommodate his orthotics.

Edwards has submitted no evidence to contradict the committee's conclusion that the DOC-approved vendors offered shoes that would accommodate his orthotics. There is no evidence, for example, that none of the approved vendors offered shoes with removable insoles, or that Edwards made a good-faith effort to try his orthotics with at least some of the shoes available from the approved vendors. Nonetheless, he contends that Waterman and the special needs committee members showed deliberate indifference to his plantar fasciitis for two reasons.

First, Edwards argues that other inmates have been permitted to order shoes from non-approved vendors that exceed the $75 limit, so he should be allowed to as well. But decisions regarding medical needs must be made on a case-by-case basis depending on an inmate's specific medical needs. That another inmate was allowed to order a certain type of shoe does not establish that Edwards had a medical need for the same shoe. Edwards has not submitted evidence showing that any other inmate had precisely the same medical needs as he did or that Waterman or the special needs committee members were presented with the same types of orders as those made by Dr. Finnell in this case.

Second, Edwards contends that the special needs committee had no authority to reject Dr. Finnell's recommendation that Edwards should be allowed to order Nike Air Max shoes. Edwards is correct that, under some circumstances, "[a] jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018) (citation omitted). And "[f]ailing to provide care for a non-medical reason, when that care was recommended by a medical specialist, can constitute

13

deliberate indifference." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). But this does not mean that prison officials must "always" follow a recommendation from a specialist. *Wilson*, 901 F.3d at 822. In this instance, Waterman and the defendants who were part of the special needs committees that denied Edwards's requests explained that they did not interpret Finnell's recommendations regarding the Nike Air Max shoes as "prescriptions" or statements that a specific shoe was "medically necessary." Defendants instead understood Finnell to be recommending that Edwards stop wearing the state-issued canvas shoes and order an athletic-style shoe that would accommodate his orthotics.

Defendants' interpretation of Dr. Finnell's orders was reasonable, and no reasonable jury could conclude otherwise. Between October 2012 and December 2014, Finnell made numerous recommendations regarding Edwards's need for different shoes, sometimes stating that Edwards needed shoes that were "athletic-style," "extra deep," or have removable insoles, and at other times stating that Edwards should order shoes from the "Eastbay" catalog. Finnell sometimes stated that Edwards should be permitted to order the Nike Air Max shoe in particular, while at other times, Finnell identified the Nike Air Max shoe as one type of shoe that would accommodate Edwards's orthotics better than the state-issued canvas shoes. Finnell never stated in his recommendations that the Nike Air Max shoes were medically necessary to treat Edwards's plantar fasciitis. Finnell's orders also do not give any reason why the Nike Air Max shoe in particular would perform better than an athletic-style shoe from the approved vendor catalogs. Reviewed as a whole, Finnell's recommendations show his concern about Edwards's continued use of the state-issued canvas shoes and his belief that Edwards needed a shoe that would better accommodate his orthotics. *See, e.g., Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017) ("The fact that [prison doctor] disagreed with the podiatrist's

recommendation for special shoes is not material here because the shoes were not prescribed, only recommended pending 'prison medical department' approval."). Finnell's December 2014 order clarifying that Edwards did not need to have Nike Air Max shoes in particular, as well as Finnell's declaration, Dkt. 72, and the opinion of the Aljan's orthotist, confirm that Waterman's and the special needs committee's interpretation of Finnell's orders was reasonable and correct. Accordingly, Edwards has not shown that Waterman, Anderson, Kartman, Sweeney, Sutter, or Shannon-Sharpe acted with deliberate indifference to his serious medical needs when they denied his requests to order Nike Air Max shoes.

For many of the same reasons, Edwards also cannot succeed on his claim that Waterman and Friedrich acted with deliberate indifference by failing to provide him with the Air Jordan shoes his mother shipped to him. It is undisputed that the Air Jordan shoes were ordered from a non-approved vendor, that the vendor told Waterman that the shoes cost more than $75, and that Waterman believed the receipt provided by Edwards's mother had been altered in an attempt to show that the shoes did not exceed the $75 property limit. Waterman concluded that Edwards should not receive a medical exception to the property rules because the Air Jordan shoes were not medically necessary to treat Edwards's plantar fasciitis and Edwards could order shoes from the approved vendor catalogs to accommodate his orthotics. As discussed above, Edwards has submitted no evidence to contradict Waterman's conclusions. As for Friedrich, he had no authority to deliver property that violated DOC policy or to override Waterman and grant Edwards a medical restriction. Further, he was entitled to rely on Waterman's interpretation of Edwards's medical restrictions. *See Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 676 (7th Cir. 2012) (non-medical staff generally entitled to rely on judgment of medical professionals treating inmate); *Arnett v. Webster*, 658 F.3d 742, 755

(7th Cir. 2011) (same). Under these circumstances, Edwards cannot show that Waterman's or Friedrich's decision to deny the Air Jordan shoes amounted to deliberate indifference.

Finally, Edwards cannot succeed on Eighth Amendment claims against Kool or Boughton. The undisputed facts show that Kool had no authority to grant or deny medical accommodations and Kool had no involvement in denying Edwards's request to order special shoes. Thus, even if Edwards had facts sufficient to establish an Eighth Amendment violation, Kool could not be held liable. *See Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (citation omitted). Boughton also was not personally involved in the decisions to deny Edwards's request to order special shoes or to deny Edwards's access to the Air Jordan shoes that his mother had sent. Boughton reviewed the decisions in his role as reviewing authority in the inmate complaint review system, but he deferred to the conclusions by medical staff that the specific shoes Edwards had requested were not medically necessary. In light of the undisputed evidence in the record, Boughton's actions were reasonable and do not support an inference of deliberate indifference.

In sum, there is no basis to conclude that any of the defendants acted with deliberate indifference in their treatment of Edwards's foot condition when they declined to allow him to order or receive Nike Air Max shoes, Air Jordan shoes, or any other shoe costing more than $75, from a non-approved vendor catalog. Accordingly, defendants are entitled to summary judgment on Edwards's Eighth Amendment claim.

**B. Medical malpractice claims against Waterman and Anderson**

In addition to his Eighth Amendment claim, I granted Edwards leave to proceed on a claim that Waterman and Anderson, both of whom are nurses, committee medical malpractice

when they denied his requests to order special shoes to treat his plantar fasciitis. Defendants argue that this claim fails because Wisconsin's medical malpractice statute does not permit medical malpractice claims against nurses or nursing supervisors. This argument fails, for the reasons I explained in *Smith v. Hentz*, No. 15-CV-633-JDP, 2018 WL 1400954, at *3 (W.D. Wis. Mar. 19, 2018).

Alternatively, defendants argue that Edwards's claim fails on the merits. I agree. Like other negligence claims, a claim for medical malpractice includes these four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp,* 2001 WI 42 ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Wisconsin law more specifically defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999); *Shuster v. Altenberg*, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161–62 (1988). To succeed on his claims against Waterman and Anderson, Edwards has to show that Waterman and Anderson failed to use the required degree of skill exercised by an average nurse or nursing supervisor, he suffered harm, and there is a causal connection between the nurses' failures and his harm. Wis J–I Civil 1023. Edwards cannot make that showing in this case because he has produced no evidence showing that the average nurse or nursing practitioner would have granted him permission to order a particular type of special shoe that was not medically necessary and that failed to meet DOC property rules. Therefore, Waterman and Anderson are entitled to summary judgment on Edwards's medical malpractice claim.

## ORDER

IT IS ORDERED that:

1. Defendant' motion for summary judgment, Dkt. 59, is GRANTED.

2. Plaintiff Tremayne D. Edwards's motion for summary judgment, Dkt. 42, is DENIED.

3. Plaintiff's motion for reconsideration of a deadline extension, Dkt. 54, is DENIED as moot.

Entered January 16, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge